# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50318 | **DATE** | 7/22/2004 |
| **CASE TITLE** | Boyd vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's motion for summary judgment is denied. The ALJ's decision to deny benefits to Plaintiff is sustained and the ALJ is affirmed at all steps of the disability determination process. Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | 7-23-04 | |
| | Notified counsel by telephone. | | | date docketed | 16 |
| | Docketing to mail notices. | | U.S. DISTRICT COURT | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2004 JUL 22 PM 4:25 | 7/22/2004 | |
| | | | FILED-WD | date mailed notice | |
| sp | courtroom deputy's initials | | Date/time received in central Clerk's Office | sp mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| **DONNA F. BOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 03 C 50318** |
| | ) | |
| v. | ) | **Magistrate Judge** |
| | ) | **P. Michael Mahoney** |
| **JO ANNE B. BARNHART,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Donna F. Boyd ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on October 27, 2003. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.     BACKGROUND

Plaintiff filed for DIB on October 16, 2000, alleging disability on January 31, 1995. (Tr. 89-91). Plaintiff's application for benefits was denied on January 18, 2001. (Tr. 53). On March 7, 2001, Plaintiff filed a request for reconsideration. (Tr. 57). Plaintiff's request for reconsideration was denied on April 23, 2001. (Tr. 59). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on May 17, 2001. (Tr. 62). Plaintiff appeared, with counsel, before an ALJ on October 4, 2001. (Tr. 14). In a decision dated February 22, 2002, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 81). On February 27, 2002, Plaintiff requested a review

of the ALJ's decision by the Appeals Council. (Tr. 12). On July 25, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 6).

## II.    FACTS

### A.    Background

Plaintiff's date of birth is December 5, 1956 and was forty-seven as of this writing. (Tr. 20). At the time of her hearing in October 2001, Plaintiff lived at a recovery house and had lived there for approximately ten months. (Tr. 19). At the recovery house, Plaintiff had a bedroom and shared kitchen and bathroom facilities with other residents. (Tr. 20). Her assigned chore in the house was to do the dishes. (Tr. 37). Plaintiff received a GED and was enrolled in two community college courses at the time of her hearing. (Tr. 29-30). She does not have a car nor does she have a driver's license. (Tr. 33). She uses the bus for transportation. (*Id.*). Plaintiff claims to be disabled as a result of the following impairments: hepatitis C, arthritis in the lumbar spine, scoliosis, dysthymia, varicose veins in the left leg, and a history of drug and alcohol abuse in sustained remission.

### B.    Work History

Plaintiff worked as a gum packer at Warner-Lambert from 1998 to 1999. (Tr. 108). The gum packing job consisted of sitting at a conveyer belt, packing gum coming off the conveyer belt into boxes, and sliding the boxes along another conveyer belt. (Tr. 22-23). Plaintiff was only required to lift the gum but not the boxes. (*Id.*). Because Plaintiff had to stand intermittently throughout the day, she could not keep up with the flow of the gum and interrupted the packing process as a result. (*Id.*). Additionally, Plaintiff had trained others to perform the job and was still using illegal drugs during this period of her employment. (*Id.*).

For a two week period, Plaintiff worked as a food preparer in a fast food restaurant. (Tr. 23).

2

She was making sandwiches and deep frying french fries but stated the job only lasted two weeks because she repeatedly burned her hands on a deep frier. (*Id.*).

## C.    Physical Ailment Testimony

Plaintiff testified her orthopedic doctor prescribed a cane that she had at the hearing. (Tr. 23-24). She indicated she had bad pain in her lower back above the tail bone that was always present but worse in the winter. (Tr. 24-25). Plaintiff said she was paralyzed when she was younger and had six plastic vertebrae. (*Id.*). She also stated her spine was curved. (*Id.*).

Plaintiff stated she had no sensation in her right hand and arm and up to her right ear with the exception of some sensation above her right elbow. (Tr. 25-27). She testified these impairments resulted from a domestic violence situation six years prior and were permanent. (*Id.*). Plaintiff can use her right hand to pick things up but has to monitor her hand when she does because she forgets she is holding things and often drops things. (*Id.*).

When asked if she had any pain in her neck, Plaintiff responded that she has an itching pain inside of her head. (Tr. 27-28). She indicated that a doctor told her the itching was related to scar tissue from the abuse and that the only remedy is to apply a cold compress. (*Id.*).

Plaintiff testified she has problems sleeping. (Tr. 28). She uses a blanket to prop up her neck instead of a pillow and has problems both getting to sleep and waking after falling asleep. (*Id.*). She indicated she gets approximately four hours of uninterrupted sleep per night. (*Id.*).

Plaintiff can only walk roughly half a block before her legs give out and can only stand for roughly ten minutes before her back begins to hurt. (Tr. 28-29). She also can sit for approximately ten minutes before her back pain sets in. (*Id.*).

Plaintiff indicated she had hepatitis and was depressed. (Tr. 30-31). She claimed to be

fatigued as a result of the hepatitis but got no relief from the fatigue after resting. (*Id.*). She also indicated she was taking anti-depressant medication and had access to counseling through her recovery program. (*Id.*). Plaintiff did not partake in any social activities outside of attending school and counseling sessions. (*Id.*). She was visibly teary at the hearing. (Tr. 33).

Plaintiff further testified she had swelling in her legs most of the time and her left leg was an inch and a half larger than her right. (Tr. 32-34). She claimed part of her ankle bone was removed when she was younger and her circulation was impaired as a result of the surgery. (*Id.*). Plaintiff's legs gave out approximately nine times in the last year when she was walking, and she has scarring on her legs from the falls. (*Id.*). Additionally, she has constant pain in both knees that gets worse when she walks more than half a block and in humid or cold weather. (Tr. 38-39). Her orthopedic doctor has administered cortisone shots in both knees. (*Id.*). Plaintiff was taking Celebrex by prescription because it is covered under her health care program. (Tr. 40). She also was taking ibuprofen and Aleve over-the-counter for pain. (*Id.*).

D.    Vocational Expert Testimony

Ronald Gehrig, Vocational Expert ("VE"), testified at the hearing and decided there were four jobs for the ALJ's first hypothetical, two jobs for the ALJ's second hypothetical, and no jobs for the ALJ's last hypothetical. (Tr. 43-46). First, the VE classified Plaintiff's gum packing job as unskilled sedentary work because she sat at the conveyer belt. (Tr. 43). The ALJ presented a first hypothetical to the VE as follows:

> Taking someone of Ms. Boyd's age, which is from forty-three to forty-four during
> the relevant period, has a high school equivalency degree, past relevant work as
> you've described it. For purposes of this question, can lift up to twenty pounds
> occasionally, ten pounds frequently. Sit for an unlimited amount, but can stand or
> walk for no more than two hours out of an eight hour day if interspersed though the

4

day. Can only occasionally bend, cannot climb ladders or scaffolds. Cannot – avoid dangerous machinery. Cannot perform detailed or complex tasks.

(Tr. 43). The ALJ asked the VE if there was any work that a person with those restrictions could perform. (*Id.*). The VE responded that the person could perform the job of assembler for which there were 8,291 jobs in the State of Illinois at the sedentary level and 18,000 at the modified light level.[1] (Tr. 43-44). The person could also perform the job of sedentary cashier (26,089 jobs in Illinois and 35,000 at the modified light level), sedentary telephone operator (4,693 in Illinois and 750 at the modified light level), and sedentary hand packer (250 in Illinois and 6,500 at the modified light level). (Tr. 44-45). Next, the ALJ modified the hypothetical by adding that the person must use a cane to walk and asked the VE what effect the modification would have on the person's ability to do the three jobs. (Tr. 45-46). The VE responded by stating the telephone operator or cashier jobs would not be affected significantly, but the assembler job would be affected significantly. (Tr. 46). The ALJ further modified the hypothetical by assuming this person can only walk a half block at a time, can only stand for ten minutes at a time or sit for ten minutes at a time. The VE stated there would be no jobs. (Tr. 46).

After further examination by the Plaintiff's attorney, the VE concluded Plaintiff could not perform her previous gum packing job. (Tr. 47). Plaintiff's attorney asked the VE if someone who had to get up with a fair degree of frequency could perform the unskilled sedentary job of gum packer given that when Plaintiff stood up at the gum packing job, the gum flew everywhere. (*Id.*). The VE initially responded yes, the job could be performed even if the person had to get up with a

---

[1] In determining the modified light level, the VE eliminated approximately half the jobs in the light category based on the ALJ's modification that the hypothetical worker could perform the lifting associated with light jobs but was limited to standing or walking for no more than two hours out of an eight-hour day if interspersed throughout the day. (Tr. 43).

fair degree of frequency. (*Id.*). However, after Plaintiff further described the specific circumstances of the job and her failure to keep up with the conveyer line, the VE concluded Plaintiff could not perform the job if she had to get up suddenly because of the speed and size of the machines involved in the packing process and because the process could not be modified. (*Id.*).

Next, Plaintiff's attorney returned to the ALJ's second hypothetical with the modification requiring the person to use a cane for walking. (Tr. 48). Plaintiff's attorney asked if the remaining jobs would be affected if the person had to be aware of her right hand on a constant basis due to parasthesia. (*Id.*). The VE stated there would be some effect but people are generally pretty much aware of what they have in their hands. (*Id.*). Plaintiff's attorney then asked the VE what the minimum amount the person would have to sit to do the sedentary jobs that remained in the second hypothetical with the cane and how much the person would have to sit continuously at any one time. (Tr. 48-49). The VE responded that the person would have to sit six hours in an eight hour day and for at least forty-five minutes hours continuously. (*Id.*).

## MEDICAL HISTORY

Plaintiff's medical history included extensive vertebral reconstruction after a fall from a three story building at age 13 in 1970. (Tr. 148). While Plaintiff reported this injury to her treating physicians multiple times in the record and to the Social Security Administration, there is no specific discussion of the injury in the record by any treating physician. She had an appendectomy in 1993, had never been pregnant, had outpatient counseling and treatment for cocaine abuse, and had been hospitalized in 1995 for right arm cellulitis. (*Id.*).

On July 9, 1997, Plaintiff was admitted to Rockford Memorial Hospital under the care of Dr. Daniel Herdeman after seeking emergency room treatment for two blister-like wounds on her right

hand; swelling and redness in the right elbow area; and some malaise, chills, and a sensation of feeling hot. (Tr. 148). Dr. Herdeman noted in his report Plaintiff had a similar episode in 1995 due to a Staphylococcus aureus cellulitis. (*Id.*). Dr. Herdeman's report states Plaintiff's personal history included daily smoking of two packs of cigarettes and drinking seven or more beers per day since the age of twelve. (*Id.*). She was a regular user of crack cocaine and had last consumed alcohol and cocaine twenty-four to forty-eight hours prior to admission. (*Id.*). He also indicated she was single and unemployed. (*Id.*). Upon physical examination, Dr. Herdeman noted Plaintiff appeared older than her stated years but was in no distress. (*Id.*). Her height was 5' 4", weight was 163 pounds, temperature was 99.5 degrees, pulse was 92, respiratory rate 16, and her blood pressure was 106/68. (*Id.*). She had several teeth missing and substantial tooth decay. Her skin had a pasty texture but was otherwise unremarkable, and her lymph nodes were palpable in the right axillary region. (*Id.*). Her chest showed normal auscultation and excursion, and her heart rate and rhythm were normal. (*Id.*). Dr. Herdeman described her abdomen as free from tenderness. (*Id.*). Her legs were symmetric and had no evidence of joint inflammation, and her left arm appeared normal. (*Id.*). The right arm showed a redness and swelling at the elbow without lymphangitic streaks. (Tr. 149). Her right hand had an oval unroofed blister on the distal thumb measuring approximately one inch by one and a half inches and an oval unroofed blister on the thenar eminence with the same measurement. (*Id.*). She also had calluses on her thumb and her distal second and third fingers. (*Id.*).

Dr. Herdeman's neurologic report indicated Plaintiff was alert and oriented in all spheres with cranial nerves two through twelve appearing intact. (*Id.*). Her speech volume was normal, content, and fluent. (*Id.*). Her mobility and strength was normal in all limbs, but her right arm was substantially anesthetic with some sensation near the posterior shoulder and upper arm. (*Id.*). There

was no detectable sensation in the forearm or hand. (*Id.*). Plaintiff's CBC was normal and had elevated GGT levels, but serum chemistries were otherwise normal. (*Id.*).

A culture of the blisters showed Staphylococcus aureus, Klebsiella, and Strep viridans. (Tr. 145.). Dr. Herdeman prescribed Cefazolin to treat the infections and the swelling improved substantially in twenty-four hours. (*Id.*). Plaintiff subsequently had the abscess in her elbow area surgically drained on July eleventh. (*Id.*). An x-ray showed the infection did not intrude on the bone in her arm. (*Id.*). Plaintiff spoke to substance abuse counselors but indicated to Dr. Herdeman she was not interested in seeking treatment at that time. (*Id.*). She was discharged July 12, 1997 with instructions to take 500 milligrams of Cephalexin four times a day for seven to ten days at which time she was to come to Crusader Clinic for a wound check. (*Id.*). The official diagnosis was right arm abscess, partial thickness burn of the right hand, cervical neuropathy of the right arm, and substance abuse. (*Id.*).

On August 7, 1998, Plaintiff was seen at SwedishAmerican Health System by Dr. Oscar Habhab for treatment of swelling in her right hand. (Tr. 151). Plaintiff indicated she had a history of cellulitis to the right hand and had an infection drained two years prior. (*Id.*). Physical examination showed some slight edema to the right hand with no redness, tenderness, deformity, or skin lesions. (*Id.*). She had full range of motion in her right wrist and hand with normal distal sensation and vascularity. (*Id.*). Dr. Habhab ruled out acute cellulitis and prescribed 500 milligrams of Cepahlexin twice a day for five days. (*Id.*).

Dr. Kamlesh Ramchandani saw Plaintiff for a medical assessment on December 20, 2000 at the request of state disability examiners. (Tr. 196-200). Dr. Ramchandani's report indicated Plaintiff complained of cramps and swelling in her left leg for the past two years that were worse

when standing or walking for more than a block. (*Id.*). She also complained of neck and back pain that was aggravated when lifting more than ten pounds, sitting or standing for more than twenty minutes, or walking more than a block. (*Id.*). Plaintiff also reported feeling tired and was unable to do any household activities. (*Id.*). Her past medical history listed a one year diagnosis of hepatitis C and depression. (*Id.*). At the time, she was smoking two packs of cigarettes per day, drinking ten to twelve cans of beer per day, and smoking crack cocaine regularly. (*Id.*).

Dr. Ramchandani's physical exam revealed Plaintiff to be alert, oriented, in no acute physical distress, and with normal vital signs. (Tr. 197). Plaintiff's gait was normal unassisted, and she was able to walk on her heels and toes. (*Id.*). She was able to squat and get up from a squatting position without assistance as well as able to get on and off the examination table without difficulty. (*Id.*). Her grip was rated good in both hands, and she was able to pick up objects, open and close the door, oppose her thumb to fingers, make a fist, and flip pages. (*Id.*). She exhibited mild to moderate cervical spine range of motion limitations and mild lumbar spine range of motion limitations. (*Id.*). Plaintiff's head, eyes, ears, nose, throat, neck, cardiovascular system, respiratory system, and abdomen all tested normal. (*Id.*). Her power was also rated as good with normal tone and muscle mass and she exhibited no range of motion restrictions. (Tr. 197-200). Dr. Ramchandani did note Plaintiff has reduced sensation with near absent sensation in the right upper extremity extending from the posterior aspect of the right shoulder joint to the tips of her fingers on the right side. (Tr. 197). Dr. Ramchandani's diagnosis was hepatitis C with malaise, discogenic disease of cervical and lumbar spine, varicose veins in the left leg, and polysubstance abuse. (Tr. 198).

On January 1, 2001, medical consultant Dr. Barry Free filled out a residual capacity assessment on Plaintiff for the Commissioner. (Tr. 201-208). Dr. Free indicated Plaintiff could lift

up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 202). He also noted she could stand and/or walk with normal breaks for a total of six hours in an eight hour day, and she could sit for a total of about six hours in an eight hour day. (*Id.*). The only limitation Dr. Free noted in the report was that Plaintiff should avoid situations requiring feeling on her right side due to her decreased sensation. (Tr. 204). The doctor also noted Plaintiff has reduced capacity to do light work as a result of her fatigue. (Tr. 206).

Dr. William Baxter from Crusader Clinic ordered a lumbar five view routine imaging exam for Plaintiff that was performed April 30, 2001. (Tr. 222). Dr. Frank Bonelli from SwedishAmerican Hospital analyzed the test and reported Plaintiff had normal alignment of five lumbar-type vertebral bodies. (*Id.*). There was moderate marked wedge compression of L1 that appeared old due to osteophytes ventrally. (*Id.*). There also was associated kyphosis but no retropulsion. (*Id.*). Plaintiff's images showed severe disk space narrowing with vacuum disk phenomenon and vetral osteophytes as well as endplate changes at L2-3. (*Id.*). Additionally, Dr. Bonelli reported on a dorsal/thoracic spine exam for Plaintiff that showed mild thoracic curve convexed to the right. (Tr. 223). The thoracic spine was otherwise unremarkable. (*Id.*). Dr. Marc Bernstein from SwedishAmerican Hospital reported on a cervical spine image of Plaintiff's spine that showed a reversal of the normal lordotic curve of the cervical spine with degenerative changes at C3-4 and 4-5. (Tr. 224). Dr. Bernstein also reported degenerative changes of the facet joints, but no fractures or dislocations. (*Id.*). Plaintiff was encouraged to seek employment that was low impact and/or light duty. (Tr. 226).

Plaintiff was treated for substance abuse at Rosecrance on Harrison from December 18, 2000 to June 1, 2001. (Tr. 254). She was assessed on October 10, 2000 and diagnosed via the DSM IV

with cocaine, alcohol, and cannabis dependence with physiological dependence. (*Id.*). She was also diagnosed with sedative, hypnotic, or anxiolytic abuse. (*Id.*). The discharge summary signed by Primary Counselor Shirley Mueller and Dr. Barry Speigal indicated Plaintiff was able to stay clean and was a role model for others in recovery. (*Id.*). Prognosis was listed as very good for Plaintiff's recovery, and the report indicated she was physically and mentally stable at the time of discharge. (Tr. 257).

Clinical Psychologist Dr. Harold Best conducted a mental evaluation on November 1, 2000, at the request of state disability examiners. (Tr. 174-176). Dr. Best summarized the exam by stating Plaintiff was a forty-three year old female with a history of alcohol, cocaine, and opioid dependence and was still shaking from detox. (*Id.*). Plaintiff made good eye contact and related acceptably well during the interview. (*Id.*). She exhibited normal posture and gait with normal behavior without tics or speech disorders. (*Id.*). Her thought processes were intact with adequate control and normal speed of thought free of delusions. (*Id.*). Orientation was described as adequate, but memory was deficient, likely affected by chronic alcoholism. (*Id.*). Her fund of information was fair, but her attention, concentration, and calculation were deficient. (*Id.*). Additionally, Plaintiff's abstract abilities were fair while her judgment and insight were deficient. Lastly, Dr. Best indicated Plaintiff was then currently unable to handle her own funds due to her substance abuse. (*Id.*).

## IV.    STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir.

11

1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 998 F.2d 473, 487 (7th Cir. 1993), *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986), cert. denied. "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be

---

[2]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467, 470-71 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a

---

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a).

Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A.  Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on February 22, 2002. (Tr.84).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding.  The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments.  Specifically, the ALJ found Plaintiff suffered from arthritis in the lumbar spine, scoliosis, dysthymia, a history of substance dependence in current sustained remission, hepatitis C, and varicose veins in her left leg.  (Tr. 84).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it.  The ALJ's finding as to Step Two of the Analysis is affirmed.

C.     Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments

16

do not meet or equal any impairment in Appendix 1, Subpart P, Part 404 of the regulations. (Tr. 84).

The ALJ stated the following:

> In this case, for example, the claimant's back impairment does not satisfy the requirements of section 1.04. Similarly, the claimant's's dysthymia results in mild limitation in activities of daily living and social functioning, moderate limitations in attention and concentration and has resulted in no episodes of deterioration or decompensation. Thus, her affective disorder does not satisfy the severity requirements of section 12.04. Even when the claimant's impairments are considered in combination, her impairments do not satisfy the Listings.

(Tr. 84). This court would have liked to have seen the ALJ address section 1.05(C) of the Listings that applies to other vertebrogenic disorders of the spine. However, Plaintiff would fail under this section using the "reasonable" standard this court adopted in *Pazera*. *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 1; *See Pazera v. Barnhart*, 2003 U.S. Dist. LEXIS 23121, at 35 (N.D. Ill. Dec. 23, 2003). Section 1.05(C) requires both 1) pain, muscle spasm, and significant limitation of motion in the spine; and 2) appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 1. Plaintiff fails to meet the first requirement as evidenced in Dr. Ramchandani's report which did not indicate any evidence of muscle spasm or significant limitation of motion in the spine. (Tr. 187, 200). Using the standard this court adopted to handle incomplete Step Three analyses in *Pazera*, this court finds a reasonable ALJ could not find this Plaintiff's spinal impairments meet or medically equal an impairment in the 1.05(C) listing. *See Pazera*, 2003 U.S. Dist. LEXIS 23121, at 35. Because Plaintiff would fail to satisfy the impairment requirements of section 1.05(C) of the Listings, this court sees no reason to remand.

Substantial evidence exists to support the ALJ's finding and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

17

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.. (Tr. 86). Before doing so, the ALJ determined Plaintiff's RFC as follows:

> [Plaintiff] can lift up to twenty pounds occasionally and ten pounds frequently, stand and/or walk for two hours in an eight-hour day if interspersed as long as she is allowed to use a cane for ambulation, sit an unlimited amount, not operate dangerous moving machinery or perform detailed or complex tasks.

(Tr. 84). The ALJ went on to state that given Plaintiff's non-exertional limitations, she cannot perform her past work as an assembler. (Tr. 86). In support of this assertion, the VE testified at the hearing the additional restriction of the use of the cane would eliminate the assembler jobs. (Tr. 45). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the Commissioner carries the burden to show Plaintiff's RFC allows her to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The ALJ determined that although Plaintiff's RFC did not allow her to perform a full range of light work, there existed a significant number of jobs in the national economy that she can perform. (Tr. 86). The ALJ stated if Plaintiff could perform a full range of light work, rule 202.20 of the Medical-Vocational Guidelines, Appendix 2, Subpart P, Regulations No. 4 would direct a

18

finding of not disabled. (*Id.*). However, the ALJ found Plaintiff has the RFC to perform a narrowed range of light work. (*Id.*). The VE testified someone with Plaintiff's RFC and vocational profile[4] could perform work as an assembler (18,290 jobs in Illinois), cashier (62,000 jobs in Illinois), telephone operator (5,343 jobs in Illinois), and hand packer (6,750 jobs in Illinois).[5] (*Id.*).

The ALJ's Step Five conclusions are substantially supported by the medical evidence in the record. Specifically, the ALJ pointed out Plaintiff was described in June of 2001, at the time of her discharge from her substance abuse rehabilitation program, as having achieved excellent progress; possessing a very good prognosis; being physically and mentally stable; and being an excellent role model to others in recovery. (Tr. 254-257). She had earned her GED and was attending community college classes in October of 2001. (Tr. 29-30). Plaintiff reported a positive response to medication therapy for depression as a likely result of her sustained sobriety. (Tr. 92-95). While she was diagnosed with hepatitis C, her tests showed normal liver function. (Tr. 85). Additionally, even though Plaintiff exhibited some spinal abnormalities; loss of sensation in her right upper extremity; and some mild pedal edema affecting the left lower extremity, upon a December 20, 2000[6] physical examination, Plaintiff was able to heel to toe walk, squat, and get on and off an examination table without difficulty. (Tr. 196-200). Also on December 20, 2000, Plaintiff's grip was rated good in both hands, and she was able to pick up objects, open and close the door, oppose her thumb to

---

[4]Plaintiff's vocational profile consisted of her being a younger individual with a high school equivalency diploma, past unskilled work experience, and no transferable skills. (Tr. 86).

[5]The ALJ apparently included the assembler jobs in the available jobs to Plaintiff even though the VE eliminated those jobs with additional restriction that the person must use a cane for walking. However, the remaining jobs still constitute a significant number of jobs in the economy.

[6]Approximately six years after her claimed onset of disability.

fingers, make a fist, and flip pages. (*Id.*). Nor was there any evidence of joint inflamation, low back muscle spasm, or compromised gait. (*Id.*). Furthermore, no treating physician had suggested Plaintiff was disabled. (Tr. 85). On the contrary, Plaintiff was encouraged to seek employment with low impact/light duty in April of 2001 by a treating physician. (Tr. 226). Lastly, there was no evidence any of Plaintiff's treating physicians prescribed the use of a cane. (Tr. 86).

The ALJ considered several factors in assessing the credibility of Plaintiff's assertions of disability citing Social Security Ruling 96-7p and 20 CFR 416.926. (*Id.*). First, Plaintiff had responded well to treatment, especially since reaching sobriety. Second, she sat for fifty-five continuous minutes at the hearing, contrary to her assertion she could only sit for ten minutes at a time. Third and last, the ALJ noted Plaintiff's primary treatment for pain was over-the-counter medication. (*Id.*). While this court accepts the ALJ's conclusion that all of Plaintiff's assertions cannot be accepted based on evidence in the record, the court notes that Plaintiff's written statement that she chooses not to take narcotic pain medication because of her long history of substance abuse largely mitigates the ALJ's last reason in assessing Plaintiff's credibility. (Tr. 135).

Plaintiff claims that the ALJ failed to consider the VE's testimony based on Plaintiff's RFC as indicated by the medical evidence. (Pl's Mem. at 4). Plaintiff also states the ALJ failed to reconcile the VE's concessions on cross examination by Plaintiff's counsel; with the evidence, in rejecting the VE's conclusion that no jobs remained. (*Id.*). Both arguments are predicated on the contention that the ALJ did not accurately assess Plaintiff's RFC based on Plaintiff's testimony and her medical records. This contention is false. As discussed above, the ALJ points to numerous places in the transcript that support her Step Five determination. For example, the ALJ points to Plaintiff's highly positive prognosis upon discharge of her substance abuse program; her mild to

moderate spinal range of motion limitations; her ability to walk on the heels and toes and stand from a squatting position without assistance; her ability to exhibit full strength and normal dexterity in her right arm despite her loss of sensation; and the fact that a treating physician encouraged her to seek light work. Additionally, the ALJ reasonably assessed Plaintiff's credibility in light of the medical evidence.

This is a close case with a Plaintiff that has substantial impairments. This court might have written a different opinion than the one put forth by the ALJ. No matter. Substantial evidence in the record supports the ALJ's determination, and the ALJ has built a logical bridge between the record and the claim.

Substantial evidence exists to support the ALJ's determination that Plaintiff is capable of performing work existing in substantial numbers in the national economy. The ALJ's finding as to Step Five of the Analysis is affirmed.

## VII.   CONCLUSION

For the above stated reasons, Plaintiff's motion for summary judgment is denied. The ALJ's decision to deny benefits to Plaintiff is sustained and the ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's motion for summary judgment is granted.

**ENTER:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**

DATE: 7/22/04